Herbert Allen and Helen Daniels Allen v. Commissioner.
Allen v. Commissioner
Docket No. 34322.
United States Tax Court
1952 Tax Ct. Memo LEXIS 42; 11 T.C.M. (CCH) 1093; T.C.M. (RIA) 52323; November 12, 1952
*42 1. Held: The taxpayer, engaged in research work as part of his employment by a corporation, was not in the trade or business of conceiving and selling patentable ideas, his inventions either belonging to the corporation without additional compensation or being subject to the corporation's option to acquire them at a predetermined price. 2. Held: The assignment of patentable ideas held as capital assets by a taxpayer more than six months after the reduction of the patentable ideas to practice resulted in long-term capital gain. G. Kibby Munson, Esq., for the petitioners. M. Clifton Maxwell, Esq., and D. Louis Bergeron, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined a deficiency in the income tax of petitioners for the year 1948 in the amount of $5,133.18. The sole issue to be determined in this proceeding is whether the amount of $22,762.54 received by petitioners in the taxable year is taxable as ordinary income or as long-term or shortterm capital gain. Findings of Fact The facts stipulated are found accordingly. Petitioners Herbert Allen and Helen Daniels Allen are husband and wife, residing *43 in Houston, Texas. They filed a joint income tax return for the year 1948 with the collector of internal revenue for the first district of Texas. Herbert Allen, hereinafter referred to as the petitioner, is a graduate engineer, who began work in 1931 for the Abercrombie Pump Company, which was affiliated with J. S. Abercrombie Company and Cameron Iron Works, Inc. The Abercrombie Pump Company did not have its own shop or plant, manufacturing being done for it in the shop of Cameron Iron Works, Inc. The petitioner was hired to help develop improved manufacturing practices and methods, and in that work benefits would accrue to Cameron Iron Works, Inc., as well as to Abercrombie Pump Company. His efforts along these lines proved advantageous to both companies. In December, 1934, a "shop agreement" was entered into by the petitioner and his employer, Abercrombie Pump Company, setting forth the respective rights and obligations of the various parties with respect to patentable ideas and improvements in products and manufacturing processes. The petitioner had planned at one time to enter business for himself but he agreed to remain as an employee when the shop agreement was entered into. *44 This agreement provided as follows: "Herbert Allen, Houston, Texas, herein styled Employee, and Abercrombie Pump Company, a Texas corporation, domiciled in Harris County, Texas, herein styled Employer, have this day made and entered into the following agreement: "1. In consideration of the mutual agreements herein contained and during the term of employee's employment by employer, it is agreed between the parties, subject to the other provisions hereof, that employee shall be entitled to own and patent in his own right any patentable ideas originated, formulated or perfected by him, save and except as to inventions or improvements applicable or pertaining to products manufactured by or for and in behalf of Cameron Iron Works, J. S. Abercrombie, J. S. Abercrombie Company or Abercrombie Pump Company as to any of which products any such inventions and improvements so devised or perfected by said employee shall be for the full and complete benefit of that one of said companies named and engaged in manufacturing or having manufactured the product involved. Employer is under contract to provide the protection afforded by this paragraph in behalf of Cameron Iron Works and J. S. Abercrombie *45 Company above named. "2. It is understood, however, that as to any patent or patentable ideas obtained or perfected by employee and belonging to him under the foregoing paragraph, in consideration of the agreements herein, employer shall have and is hereby granted the right to acquire any such patent, patentable idea or improveent under the one of the two following arrangements to be selected by employee as herein provided. "(a) When employee conceives or comes into possession of an idea, if he wishes to perfect and develop the same at the expense and cost of employer, including in such cost and expense all development and experimental work and all cost of procuring patent, he may do so, and upon the issuance of patent shall thereupon assign and transfer the same to employer, reserving a five per cent (5%) royalty. If a patentable invention is not accomplished where employee has selected this plan "a", no part of the expense and cost shall be re-charged to employee. "(b) If employee desires to develop and perfect such patentable idea, himself bearing all of the cost of material, time, etc., incident to experimentation and development, as well as all cost of procuring patent, *46 he may do so, and upon the issuance of patent shall be obligated to transfer the same to employer, retaining in said assignment a royalty of ten per cent (10%). "At the beginning of any work on any prospective patentable idea, employee shall indicate in writing to employer whether he will proceed under subdivision (a) or subdivision (b) above, and in such writing shall tender to employer the prior right to accept and perfect employer's benefits and rights herein granted. Employer shall indicate in writing to employee its acceptance or rejection. "3. The form of assignment covering any such patent shall provide that the assignee thereof shall proceed with due diligence to manufacture and market said product. If, at the time of tender of the assignment of said patent, or if, at any time after the receipt of the assignment, assignee determines to its satisfaction that the device cannot be profitably manufactured, it shall so notify employee, who shall have the right to demand and receive a re-assignment vesting complete title in him to said patent, if he has proceeded to perfect and patent the same under the provisions of subdivision (b) above. If he has perfected the same under subdivision *47 (a) above, he shall have the right to receive said re-assignment when employer has been fully reimbursed all the cost and expense incurred in connection with perfecting of the idea and the securing of patent, as provided in subdivision (a), and said assignment above referred to, by appropriate language, shall preserve this arrangement and right, it being understood that employer shall stand fully released of all obligation upon delivery to employee of a re-assignment of any patent theretofore assigned to employer, or its nominee, under the provisions hereof. "4. Said assignment shall also, by appropriate language, provide that the royalties above stipulated shall be payable on the net amount for which said articles are sold or leased by the manufacturer, same to embrace and apply to all parts forming an integral portion and embodying the patentable idea, but shall not apply to exterior parts not integral to or embodied in the patentable idea. Said assignment shall also provide that if for any reason patent claims are invalidated, all royalty payments as to such particular patent shall be suspended until the objection is removed or overcome. Said assignment shall also provide that *48 all payments shall become due and payable on the 20th day of the calendar month covering sales made on which the sales price therefor has become due and payable to the manufacturer during the second preceding calendar month. Said form of assignment shall also, by appropriate language, make provision satisfactory to employer for the creation of a fund out of a portion of accruing royalties from which said fund or reserve expense of defending patent and prosecuting infringements may be disbursed. All jigs, patterns, molds and similar articles and information pertaining to the device or invention in each instance shall likewise be assigned to employer without added expense. "WITNESS our hands at Houston, Texas, on this the 31 day of December, A.D. 1934." * * *
Subsequent to execution of the shop agreement the petitioner served as chief engineer of the affiliated companies. The business and assets of Abercrombie Pump Company were acquired by Cameron Iron Works, Inc., in 1941. The latter corporation succeeded to the rights and obligations of the "employer" under the shop agreement. The petitioner is now vice president and general manager of Cameron Iron Works, Inc. As an employee *49 of Abercrombie Pump Company, the petitioner's job was to develop improved methods of manufacturing plant products and improvements in those products. Prior to 1948, the petitioner assigned four patentable ideas to his then employer, Abercrombie Pump Company. Patents have been issued covering these ideas and the petitioner has since been paid at the rate of 5 per cent of gross sales of products made under these patents. These patent rights were subsequently assigned to Cameron Iron Works, Inc. when it acquired the assets of Abercrombie Pump Company. During 1948 Cameron Iron Works, Inc. paid the petitioner $22,762.54 in accordance with the provisions of the shop agreement and the four assignments. The petitioner also developed patentable ideas for which 68 patents were issued and others for which patent applications are pending. All of the latter inventions were treated as improvements to the employer's products or manufacturing processes and were considered as belonging to the employer under the shop agreement without additional compensation. The first of the four patents, payment for which are in issue in this proceeding, was granted for what is called the "Type B" pressure gauge, *50 retailed drawings for which were made on September 2, 1936. A test model was completed on November 2, 1936. The petitioner assigned this invention to Abercrombie Pump Company on June 24, 1937. An application was made for a patent on July 2, 1937. A patent was granted on October 6, 1942, on the application which substantially incorporated the principles in the drawing made on September 2, 1936. On April 19, 1937, detailed drawings were made for a second pressure gauge and a prototype based thereon was promptly manufactured. On June 3, 1938, the petitioner assigned this patentable idea to Abercrombie Pump Company, and a patent was applied for on June 7, 1938. A patent on this pressure gauge was granted on October 6, 1942. Detailed drawings of a third patentable idea for a pressure gauge were made on August 9, 1939, and a prototype based thereon was manufactured soon afterwards. Assignment to Abercrombie Pump Company was made by the petitioner on November 22, 1940. An application for patent was filed on November 26, 1940, and a patent was granted thereon on February 20, 1945. Detailed drawings for a weight indicator were made on September 19, 1938. As a result of tests of models *51 made from these drawings, certain modifications were made and drawings of a "Type B" weight indicator were made on March 10 and 14, 1939. A prototype was constructed in May, 1939, and the patentable idea for a weight indicator was assigned to Abercrombie Pump Company by the petitioner on December 17, 1940, and a patent application was filed on December 23, 1940. A patent covering this weight indicator was issued on November 7, 1944. The assignments of the inventions were made by instruments which read, in part, as follows: * * *
"NOW, THEREFORE, I Herbert Allen, for and in consideration of One Dollar ($1.00) to me in hand paid, receipt of which is hereby acknowledged, and of the payment of five per cent (5%) royalty, do hereby sell, assign and convey unto said Abercrombie Pump Company all my right, title and interest in and to said invention in a Pressure Gauge above identified, saving to myself, however, only the five per cent (5%) royalty on the sales price of such articles sold by the Abercrombie Pump Company, its successors or assigns, and the Commissioner of Patents is hereby requested to issue the said Letters Patent in accordance with this assignment. "EXECUTED this *52 the 24 day of June, 1937." * * * When petitioner conceived a patentable idea which did not pertain to products manufactured by or for his employer, he approached the company and explained his idea. If his employer agreed that a workable possibility existed, a development program was undertaken under one of the two optional methods of paying expenses outlined in the shop agreement. The arrangements and agreements were made verbally in most instances. The drawings of the patentable idea were made by persons in the employ of the company for which the petitioner worked. The employer undertook a market analysis, an estimate of the manufacturing and tooling costs, and, also, determined the commercial possibilities of the inventions. In one instance the petitioner was released from the provision of the shop agreement granting his employer the right to acquire his inventions. This idea was never patented because it was discovered not to be original. Opinion VAN FOSSAN, Judge: The sole question presented is whether the sum of $22,762.54 should be taxed as long-term or short-term capital gain. The petitioner received this amount as partial payment for four inventions assigned to *53 his employer. Respondent contends that the petitioner was in the trade or business of conceiving and assigning patentable ideas, and that such inventions were not capital assets. [1] We disagree on both counts. *54 Petitioner was an engineer by profession, engaged in research for his employer under such conditions that any inventions so developed pertaining to his employer's products or processes belonged to the employer without additional compensation. The greater majority of petitioner's inventions were in this category. Such inventions were merely the products of his regular employment. The four inventions in issue here did not pertain to products manufactured by his employer but they were subject to the employer's option under the shop agreement. The evidence discloses no sales of patents or inventions by petitioner to any person or corporation other than the four patentable ideas assigned to his employer. The petitioner was not free to conduct a trade or business with these patentable ideas. He was obligated to allow his employer to acquire the inventions at a predetermined price, if it so desired. Under the facts here present as to the four inventions, the petitioner was not in the business of conceiving and selling patentable ideas nor were the inventions held primarily for sale to customers in the ordinary course of trade or business. Further, the inventions were not used in the petitioner's *55 trade or business. He was not engaged in business for himself but was an employee. The respondent further contends that the petitioner's assignment was not a sale but a license. He urges that the sale of an interest in a patent requires the grant of the exclusive right to make, use and vend the invention. ; , affirmed . The instruments transferring the petitioner's interest in these four patents stated that the petitioner does hereby sell, assign and convey unto his employer all his right, title and interest in the invention. The assignment does not purport to enumerate the rights being conveyed, but all of the petitioner's rights were effectively transferred except the right to receive a 5 per cent royalty. No particular form is required to constitute an assignment, "but the instrument of transfer must be unambiguous and show a clear and unmistakable intent to part with the patent." . The instrument in this instance meets this requisite. There was no failure by petitioner *56 to convey all his rights, and the assignment must be deemed a sale and not a license. In the alternative, the respondent contends that the sale of the patentable ideas resulted in a short-term gain on the sale of capital assets. The petitioner contends that the sales resulted in long-term capital gains. The petitioner held the patentable ideas from the time that he reduced the inventions to practice by means of drawings substantially identical to the applications upon which the patents were granted. , affirmed . These dates are set out in the findings of fact and effectively answer respondent's contention. In each case the petitioner had reduced the idea to practice more than six months before the patents were assigned. We find no merit in this contention of respondent. The amounts received by the petitioner in 1948 upon the sale of the four patentable ideas resulted in long-term capital gain. Decision will be entered under Rule 50. Footnotes
1. SEC. 117. CAPITAL GAINS AND LOSSES. (a) Definitions. - As used in this chapter - (1) Capital Assets. - The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1), * * * (2) Short-Term Capital Gain. - The term "short-term capital gain" means gain from the sale or exchange of a capital asset held for not more than 6 months, if and to the extent such gain is taken into account in computing net income; * * *
(4) Long-Term Capital Gain. - The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing net income; * * *
(b) Percentage Taken Into Account. - In the case of a taxpayer, other than a corporation, only the following percentages of the gain or loss recognized upon the sale or exchange of a capital asset shall be taken into account in computing net capital gain, net capital loss, and net income: 100 per centum if the capital asset has been held for not more than 6 months; 50 per centum if the capital asset has been held for more than 6 months.↩